UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Ulysses Williams, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:17-cv-06121 |
| | ) | |
| v. | ) | |
| | ) | Judge Iain D. Johnston |
| Wexford Health Sources, Inc. | ) | Magistrate Judge Schneider |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Williams, an inmate at Dixon Correctional Center, brings claims against

Defendant Wexford Health Sources, Inc., alleging violations of his Eighth Amendment

constitutional rights under a *Monell* theory of liability.  Williams alleges deliberate indifference

to serious medical conditions that caused deterioration of his vision, migraines, a collapsed lung,

and other pain and suffering. Before the Court is Wexford's motion to exclude the 2014 *Lippert*

report (Dkt. 127) and Wexford's motion for summary judgment (Dkt. 123). For the following

reasons, both of Wexford's motions are granted.

As an initial matter, this case has one plaintiff and one defendant. Mr. Williams brings

claims against Wexford based on alleged constitutionally-inadequate medical care he received at

Dixon Correctional Center. Wexford provides medical care and treatment to inmates throughout

the Illinois Department of Corrections ("IDOC") under a contract with the State of Illinois. Mr.

Williams does not bring claims against any individual Wexford employee. At various points in

the pleadings, Mr. Williams refers to "inmates' serious medical needs" or "inmates' health

needs" or "inmates' health and safety," *see, e.g.*, Dkt. 98, but Mr. Williams does not bring these

1

claims on behalf of a putative class. His claims are limited to his own claims against Wexford as a whole.

## I.     BACKGROUND[1]

### A.  Retinitis pigmentosa

Mr. Williams was diagnosed with retinitis pigmentosa (RP) at a young age and was deemed legally blind by age eighteen. Retinitis pigmentosa is "a progressive retinal degeneration characterized by bilateral nyctalopia [decreased ability to see in reduced illumination], constricted visual fields, electroretinogram abnormalities, and pigmentary infiltration of the inner retinal layers." Stedman's Medical Dictionary, 2014 ed., at 779320 "retinitis pigmentosa (RP)" and at 619230 "nyctalopia."[2] Mr. Williams testified during his deposition that RP has left him with only his peripheral vision, as well as sensitivity to light. He further testified that it takes his eyes time to adjust when going from outdoors to indoors and that he experiences "heavy blurry spells" when he does not wear protective glasses. Mr. Williams also testified to his history of headaches—both mild and migraine variety—which are sometimes caused by his being exposed to bright lights without protection for his eyes.

On February 11, 2014, Mr. Williams saw Dr. Hicks,[3] the prison optometrist, for his "very serious vision problems." The examination confirmed his RP and legal blindness. Dr. Hicks further observed that Mr. Williams had a visual acuity of two feet and had spicules in his eyes.

---

[1] The facts are taken from Plaintiff's Response to Wexford's Statement of Facts (Dkt. 129) and Wexford's Response to Plaintiff's Statement of Additional Facts (Dkt. 142).

[2] The parties dispute the very description of this condition. *See, e.g.*, Dkt. 129, ¶¶ 4-7. For reasons discussed below, details about the specific condition are not material to the Court's resolution of this motion.

[3] The Court notes that Mr. Williams did not disclose Dr. Hicks as a hybrid witness or provide required disclosures under Federal Rule of Civil Procedure 26(a)(2)(C), however, Dr. Hicks was deposed and counsel for Wexford Mr. Gorski conducted cross-examination. *See* Dkt. 142, ¶ 35; Dkt. 125, Deposition Transcript of Dr. Hicks (Exhibit C).

Dr. Hicks noted that Mr. Williams needed books on tape, braille lessons, closed-captioned television and a helper. The parties dispute a crucial piece of information: whether Dr. Hicks recommended and ordered a pair of sunglasses as part of his treatment on this date. But this dispute does not prevent summary judgment.

Mr. Williams asserts that "Dr. Hicks actually testified that, after his February 11, 2014 examination . . . his plan and assessment included recommending a pair of sunglasses for Mr. Williams to assist with his light sensitivity." Dkt. 129, ¶ 15; Dkt. 142, ¶ 20 (both citing Exhibit C. (Dkt. 125), at 21:4-22:2). Indeed, this statement is supported by the cited portion of the transcript from Dr. Hicks's deposition:

> Q: What was your assessment or plan after examining Mr. Williams on February 11, 2014?
>
> A: Nothing other than trying to get him some sunglasses [. . .]
>
> [ . . . ]
>
> Q: Why did you recommend sunglasses for Mr. Williams?
>
> A: There's a light sensitivity that almost all retinitis pigmentosa people have.
>
> Q: Those sunglasses would have assisted with the light sensitivity, correct?
>
> A: Right. Yes.
>
> Q: So you made a recommendation that Mr. Williams should obtain sunglasses to assist with his light sensitivity on February 11, 2014, correct?
>
> A: Yes.

Dkt. 125, at 21:4-7 and 21:15-22:2. However, Wexford asserts that there is no documented evidence that Dr. Hicks made the recommendation for sunglasses on this date, and it suggests "that Dr. Hicks testified falsely on this point." Dkt. 142, ¶ 20.

On December 6, 2014, Mr. Williams saw Dr. Hicks for a follow-up appointment during which they discussed his status and the possibility of a low bunk. Dr. Hicks also requested sunglasses and a cane for Mr. Williams at this time. (The parties dispute whether this was an initial request or a follow-up on an outstanding request from the February 11 appointment. Dkt. 129, ¶ 16; Dkt. 142, ¶ 21.)

On April 5, 2015, Dixon's Acting Medical Director Dr. Bautista participated in a collegial review with Wexford's utilization management physician in Pittsburgh, Dr. Ritz. As part of the collegial review, Dr. Ritz made the determination that the sunglasses recommended by Dr. Hicks were not medically necessary. Dr. Ritz, who is not an optometrist or ophthalmologist, did not consult Dr. Hicks before denying the request.

Mr. Williams visited the Wexford clinic multiple times in May and June 2015 for continued eye irritation, blurriness of vision, and daily headaches. It is disputed whether his headaches increased in severity and whether he experienced further vision loss. *Compare* Dkt. 129, ¶ 25 (undisputed that vision issues did not change at all during Dr. Hicks's treatment), *with* Dkt. 142, ¶ 27 (disputed that Plaintiff visited the Wexford clinic on three occasions due to "daily headaches with increasing severity, causing further loss of vision"). Again, this dispute does not prevent summary judgment.

On June 9, 2015, Dr. Hicks requested a pair of photogrey lenses for Mr. Williams—because he could not obtain regular sunglasses—and made a referral request so Mr. Williams could be seen at an offsite retina clinic at UIC.

On June 16, 2015, Dr. Dominguez saw Mr. Williams for his complaint of migraines and request for sunglasses. Dr. Dominguez determined that Mr. Williams had headaches and

migraines caused by sunlight and glare and submitted a non-formulary request form for sunglasses.

On June 17, 2015, Dr. Ritz and Dr. David held a collegial review and approved Dr. Hicks's referral request to send Mr. Williams to UIC's retina clinic.

On July 27, 2015, Mr. Williams received a pair of photogrey sunglasses as prescribed by Dr. Hicks. Mr. Williams told the medical staff that the lenses were not protecting his eyes enough, then he saw a doctor who referred him to UIC for his vision issues.

On August 24, 2015, Mr. Williams saw Dr. Hicks again, who noted that his vision issues had not changed, he was still legally blind, and he was using a cane. Dr. Hicks noted that Mr. Williams was approved to visit UIC's retina clinic, and he planned to request a pair of sunglasses for Mr. Williams.

On September 8, 2015, Mr. Williams was seen at UIC's retina clinic. The specialist discussed an experimental gene therapy for certain genotypes of retinitis pigmentosa but advised that it was experimental and not FDA-approved. It is unclear whether or to what extent the specialist recommended this treatment, which Mr. Williams was never formally assessed for.

On September 10, 2015, Mr. Williams saw Dr. Chamberlain at Dixon. Dr. Chamberlain noted that the UIC retina specialist recommended that Mr. Williams have dark sunglasses at all times and be referred to a low vision clinic. Dr. Chamberlain also noted he would check to see if dark sunglasses were permissible at Dixon and planned to place him on a chronic care clinic for his deep-vein thrombosis and retinitis pigmentosa with headaches.

On October 5, 2015, Mr. Williams received a pair of indoor sunglasses on the recommendation of the UIC retina specialist.

On October 13, 2015, Mr. Williams saw Dr. Chamberlain for his vision issues. Dr. Chamberlain noted that Mr. Williams received indoor sunglasses and that outdoor sunglasses were ordered. Dr. Chamberlain discussed low vision training and rehabilitation with Mr. Williams and advised  that he would need to wait until he was out of the correctional environment to pursue this because it focuses on helping a patient learn how to use electronic devices, cook safely, and do other daily activities that are not present in a correctional environment. Also on this day, Dr. Chamberlain planned to give Mr. Williams an exemption because of his cane and asked that he be able to leave out items in his space due to his blindness. He also asked the medical staff to check with UIC's retina clinic about a follow-up appointment.

On October 14, 2015, Mr. Williams received his dark outdoor sunglasses as recommended by UIC.

On December 10, 2015, Mr. Williams saw Dr. Chamberlain to follow-up on his vision issues, and they discussed a follow-up appointment at UIC as well as the possibility of being seen at UIC's low vision clinic. Dr. Chamberlain was waiting until after the UIC follow-up to refer him to the low-vision clinic.

On December 15, 2015,[4] Mr. Williams was approved for an appointment at UIC's low vision clinic. Mr. Williams was seen on at least three different occasions at UIC's retina clinic, and on at least two different occasions, he went to UIC's low vision clinic.

On February 25, 2016, Mr. Williams received another pair of dark sunglasses.

On October 19, 2016, Mr. Williams received another pair of indoor and outdoor sunglasses. When Mr. Williams's sunglasses broke, he received another pair.

---

[4] The Court observes that there are discrepancies with regard to the year. Here, the cited deposition testimony refers to 2015, not 2016.

On April 7, 2016, Mr. Williams was seen at UIC's retina clinic and instructed to return for a follow-up in one year.

On April 11, 2016, Mr. Williams saw Dr. Chamberlain, who completed a referral request for a one-year follow-up at UIC, as recommended. Mr. Williams reported that he still had some headaches, that Imitrex helped him some, and that he had two pairs of sunglasses, one light and one dark. Dr. Chamberlain performed an exam and noted that his intraocular pressures were normal.

On October 17, 2017, UIC's low-vision clinic provided Mr. Williams with sunglasses for outdoor and indoor glare control.

On April 24, 2018, Mr. Williams returned to UIC's retina clinic and received another pair of sunglasses for outdoor and indoor glare control. He told his medical providers he was satisfied with his sunglasses. Mr. Williams was told that gene therapy for retinitis pigmentosa was still not FDA-approved.

On June 26, 2018, Mr. Williams received a replacement pair of sunglasses because his previous pair broke.

In April 2019, Mr. Williams received another pair of sunglasses that he wears both indoors and outdoors.

This Court strictly enforces Local Rule 56.1, and failure to comply has consequences. Throughout his response to Wexford's statements of fact, Mr. Williams repeatedly asserts that Dr. Chamberlain, Dr. Bautista, and Dr. Ritz do not specialize in ophthalmology and admittedly know very little about retinitis pigmentosa, and because of this, he disputes nearly every fact statement involving their testimony. *See, e.g.,* Dkt. 129, ¶¶ 4-7, 18. In other words, Mr. Williams does not dispute the existence of the facts, but rather, argues that these treating physicians were

7

not qualified to offer those opinions or come to those conclusions. Responses to statements of fact should not include argument; argument belongs in the memorandum of law in support or opposition of summary judgment. *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 716 (N.D. Ill. 2016). To the extent that Mr. Williams' only dispute is the physician's qualifications to testify to such matters, those facts are admitted. Further, many of Mr. Williams' own statements of additional facts include impermissible argument and conclusory language, and for the same reason, those arguments presented as facts will not be considered. *See, e.g.,* Dkt. 142, ¶ 27 ("Due to the denial of adequate healthcare, Mr. Williams continued to suffer…").

Mr. Williams also disputes many of Wexford's statements of fact because they "mischaracterize" deposition testimony. But there is a difference between characterizing and impermissible mischaracterizing. For example, take paragraph 19:

> 19. On or about June 8, 2015, Dr. Hicks saw Plaintiff for a follow-up appointment. At that time, Dr. Hicks noted that Plaintiff was having issues with his vision and light perception and had retinitis pigmentosa. Dr. Hicks then planned to order Plaintiff a pair of photogrey lenses and refer Plaintiff to a retina clinic.

> RESPONSE: Undisputed that Dr. Hicks testified as set forth above. However, Mr. Williams disputes this assertion to the extent it mischaracterizes Dr. Hick's [sic] testimony. Dr. Hicks testified that he planned to order Mr. Williams a pair of photogrey lenses because he could not get regular sunglasses for Mr. Williams. According to Dr. Hicks, photogrey lenses do not provide as much protection as sunglasses.

Dkt. 129, ¶ 19 (citations omitted). Mr. Williams takes issue with this fact, not because it is untrue or incorrect, but because it does not include background details and reasoning. This is precisely the function of the statement of additional facts. *See Boyd*, 225 F. Supp. 3d at 717 ("It is improper, and a violation of Local Rule 56.1, for the nonmovant to add additional facts to his response; the additional facts belong in a separate statement of additional facts.") (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)). And in fact, he does present these facts in his statement of additional facts, but Wexford asserts that the testimony does not

reveal Dr. Hicks' mindset. Responses that follow the above formula result in the fact statement being deemed admitted.

### B. Pneumothorax[5]

A pneumothorax is a collapsed lung and can either be a partial or complete collapse. Typically, patients experience shortness of breath and chest pain, and they may also present with tachycardia, diaphoresis, nausea, and a tracheal deviation. Patients with a collapsed lung may walk around for days to weeks with the condition, depending on how it impacts the specific patient. Patients with a collapsed lung are sent to the emergency room for treatment.

On September 7, 2018, Mr. Williams was seen in the health care unit after several days of chest pains and shortness of breath. The nurse took his vitals and noted that he had wheezing, diminished lung sounds, and trouble taking deep breaths. Then, he saw Dr. Lank who listened to his chest and noted that he was unable to take deep breaths, and had no history of asthma. Dr. Lank noted that Mr. Williams' heart had a regular rhythm and no murmur, and that he had no wheezing, rales, or rhonchi. She assessed Mr. Williams with mild asthma and planned for him to receive an albuterol nebulizer, which opens the airways and helps with difficulty breathing. Dr. Lank sent him back to his housing unit and told him to relax and give the albuterol time to work.

On September 8, 2018, Mr. Williams returned to the health care unit and complained of chest pain on a scale of 8 out of 10. He was given ibuprofen and referred to a doctor. On that day, Mr. Williams also underwent an EKG, which was normal. He returned to his housing unit.

On September 12, 2018, Mr. Williams walked to the prison commissary (with the help of his mobility aid) and continued to have shortness of breath and chest pain.

---

[5] Mr. Williams is pursuing a Court of Claim case regarding treatment for his pneumothorax. Dkt. 129, ¶ 63.

On September 13, 2018, Mr. Williams returned to the health care unit for complaints of chest pain—possible strain—and shortness of breath. He was alert and oriented and in no acute distress on physical exam. The nurse noted that Mr. Williams had some diffuse crackles in his lungs and that he stated his chest "vibrates" when he takes a deep breath. An oxygen reading was not taken at this visit. The nurse was concerned he might have a buildup of mucus and provided him with Mucinex to loosen any secretions. She also ordered a chest x-ray. Nurse Tuell[6] testified that Mr. Williams did not present consistent with a patient who had a collapsed lung, that she didn't know he had a collapsed lung, and that shortness of breath and chest pain can be related to many respiratory conditions. Further, when she examined his chest, it was symmetrical when he took deep breaths. He had no tenderness on palpation, and the crackles in his lungs were consistent with bronchitis.

On Friday, September 14, 2018, Mr. Williams had a chest x-ray at Dixon, which was sent to an off-site radiologist for review because Wexford does not employ a radiologist on-site.

On Monday, September 17, 2018, an off-site radiologist read the chest x-ray and determined that it showed a complete collapse of his right lung consistent with pneumothorax. The radiologist called Dixon at 12:20 P.M. with these findings. Mr. Williams was taken out of one of his lifestyle classes and called to the heath care unit, informed he had a collapsed lung, and placed on oxygen. He was sent to KSB Hospital around 12:51 P.M., where he underwent surgery to inflate the lung. He was provided with a muscle relaxer and Tylenol after his surgery, and subsequent x-rays showed some scar tissue. Mr. Williams no longer has shortness of breath, but occasionally has some chest pain.

---

[6] The Court notes that Nurse Tuell was not disclosed pursuant to Fed. R. Civ. P. 26(a)(2)(C). Dkt. 142, ¶ 37.

Once again, Mr. Williams has run afoul of the strictly enforced requirements of Local Rule 56.1, in this instance, LR 56.1(d)(5), which limits a statement of additional facts to 40 numbered paragraphs without the express permission of the Court. The Court strikes paragraphs 41 through 47 as improperly filed. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). Although Mr. Williams only exceeds the limit by seven paragraphs, five of those are significant in that they seek to bring in other claims of purported delayed medical care at Dixon, supported by affidavit. Not only were these five witnesses not disclosed by Mr. Williams in his Rule 26(a)(1) disclosures, in at least one case, a jury found for Wexford on the deliberate indifference claim. *See* Dkt. 140 (C.B. affidavit describing deliberate indifference); *Bahrs v. Baker*, 641 F. App'x 601, 602 (7th Cir. 2016) (affirming jury verdict for Wexford on deliberate indifference). Even if the Court waived the requirement of LR 56.1(d)(5), these "fact" statements would be problematic because they contain hearsay and Wexford did not have the opportunity to investigate the claims or depose the witnesses.  Indeed, by not being timely disclosed, this evidence is barred under Rule 37(c)(1).  Fed. R. Civ. P. 37(c)(1).

### C.  Wexford's Collegial Review

Wexford's contract with IDOC included utilization management duties, and at all relevant times, Wexford had a process by which its utilization management department would review referral requests for off-site and specialty services for medical necessity and clinical appropriateness commonly known as "collegial review." Primary care physicians would use off-site specialists to obtain treatment recommendations, but the primary care physician has the right and obligation to review and disagree with a specialist. The prison medical director has the ultimate authority to review referrals made by clinicians at the facility.

During the collegial review process, which typically occurs once a week, a medical provider at the prison submits a referral request and the prison medical director presents it for review by Wexford. The Wexford utilization management physician in Pittsburgh looks at the medical necessity and clinical appropriateness of the referral requests. During this review, the Wexford physician may request and review medical records related to the request or consult outside consultants. The decision is based, in part, on the community standard of care. The request is either approved or denied, and if denied, the physician formulates an alternative treatment plan and issues a utilization management note. When approved, the timing of a patient's off-site appointment is based on the limitations of providers in Illinois as well as priority depending on the medical issue. A decision regarding the referral request can be appealed internally or to the IDOC's medical director.

### D. The 2014 Lippert Report

In *Lippert v. Ghosh*, a class-action brought by individuals in custody of the IDOC, the district court appointed a medical expert to serve as a monitor to review the allegedly inadequate medical care provided to inmates within IDOC facilities. The first report was issued by court-appointed expert Dr. Shansky in December 2014, and a follow-up report was issued in October 2018.[7] *Lippert, et al v. Ghosh, et al*, No. 1:10-cv-04603 (N.D. Ill.). The reports, which include findings specific to Dixon, among other IDOC facilities, identify various systemic failures in IDOC's healthcare system, including delays for referrals and off-site care related to Wexford's collegial review process. Mr. Williams seeks to use the 2014 *Lippert* report ("2014 Report") by Dr. Shansky to show that Wexford had notice and knowledge that its policies and procedures,

---

[7] The Court notes that the independent review of IDOC healthcare is ongoing to this day, as the Fifth *Lippert* Report was just issued in June 2022. *See Lippert v. Jeffreys*, No. 10-cv-04603, Dkt. 1579.

which allegedly caused his constitutional deprivation, were inadequate.[8] Dr. Shansky and the

other authors are not admitted as experts or witnesses in this case and have not been deposed by

Wexford.

## II.   EVIDENTIARY CHALLENGES

Wexford moves to exclude the 2014 Report for at least six reasons: (1) it is irrelevant; (2)

it is inadmissible hearsay; (3) it is unreliable and lacks personal knowledge of alleged

circumstances; (4) its admission would cause undue prejudice to Wexford; (5) it was prepared in

anticipation of settlement in another case; and (6) the order appointing Dr. Shansky under Rule

706 expressly barred litigants in other cases from using the report or deposing its authors. In

response, Mr. Williams asserts that the 2014 Report: (1) is relevant; (2) is nonhearsay because it

is offered for notice and not the truth of its contents; (3) is reliable and based on personal

knowledge because it includes findings from Dixon; and (4) was admitted in previous cases, is

highly probative, and Plaintiff would be unduly prejudiced if he couldn't use it.

### A.  The 2014 Report Is Not Relevant To Mr. Williams's Allegations

Evidence is relevant if it has any tendency to make a material fact more or less probable

than it would be without the evidence. Fed. R. Evid. 401. Relevant evidence is admissible, and

irrelevant evidence is inadmissible. Fed. R. Evid. 402. Relevant evidence may be excluded if its

probative value is substantially outweighed by a danger of unfair prejudice or risk of misleading

the jury, among other things. Fed. R. Evid. 403.

Wexford argues that the 2014 Report is not relevant because it does not address Mr.

Williams's specific medical treatment or medical issues. Dkt. 127, at 6. For example, the 2014

---

[8] Mr. Williams admittedly does not seek to use the 2018 *Lippert* Report, as it post-dates his allegations. Dkt. 130, at 5. So, the Court disregards Wexford's arguments to exclude the 2018 Report.

Report doesn't include a review or discussion of optometry services in general. Radiology is only discussed in the context of dental care, which is not at issue here. *Id.* It is Wexford's position that the 2014 Report is irrelevant because it "merely criticizes [Dixon's] tracking of emergency services and delays in obtaining documentation from ER visits after the fact" and "does not contain any criticisms that could be construed as relevant to Plaintiff's medical treatment in this case." Dkt. 127, at 6.

In response, Mr. Williams asserts that the report is relevant because the court-appointed monitor "found 'breakdowns in almost every area' of collegial review, including delays in being able to schedule a timely appointment and delays or the absence of any follow-up visit with the patient." Dkt. 130, at 4 (quoting the 2014 Report). He also asserts that the 2014 Report is highly probative "because Wexford claims it does not maintain records regarding inmate grievances," but fails to explain how inmate grievances—the process for which is set by the State of Illinois and IDOC and is not within the scope of the 2014 Report—are at all relevant to the facts at issue. Dkt. 130, at 6. Mr. Williams draws no connection between the general observations and recommendations in the report to specific details regarding Mr. Williams's care at Dixon. Mr. Williams makes no attempt to connect these findings and recommendations to specific facts from Mr. Williams's alleged inadequate healthcare, and this is precisely what Wexford points to in reply. Wexford asserts that "Plaintiff points to no substantive evidence that, in fact, these issues [in the 2014 Report] *actually* existed and were issues in his treatment." Dkt. 141, at 4.

The only relevance issue Mr. Williams raised is the collegial review process. The section of the report titled, "Scheduled Offsite Services (Consultations and Procedures)," indicates observations from the weekly collegial review teleconference:

> During the collegial review, the Pittsburgh-based physician either approves the service or suggests an alternate plan. . . . For Dixon and Stateville, despite verbal

approval received over the telephone, there is a substantial delay in Pittsburgh providing the authorization code to the University of Illinois. This delay can extend up to eight weeks or more. The scheduler at Dixon and at Stateville will call the University of Illinois scheduler, who works closely with them. Wexford changed the procedure so that the authorization is no longer given directly to the scheduler at the [IDOC] site; rather, it is given directly to the U of I scheduler, but as we indicated, this may occur up to eight weeks later. This is clearly not acceptable. . . . In many instances, the services could be obtained much more timely by using a local service rather than the University of Illinois. . . . The extraordinary delays tend to revolve around the utilization of the University of Illinois.

Dkt. 131-1, at 29. The report includes one example from Dixon in which a CT scan was ordered on November 20, 2013, collegial review and approval came two weeks later on December 4, 2013, the authorization number was provided three weeks after that, and a report was not done until February 12, 2014, approximately twelve weeks later. *Id.* at 30-31. In this example, the report showed a finding "suspicious for cancer" and a follow-up consult was approved, but the report notes that two weeks after that approval, the consult had not happened. *Id.* at 31. The report also provides, "at every facility, there were examples of patients who had received consultations or procedures but no follow up with the patient had occurred. This was quite common at some facilities, including Stateville and Dixon . . ." *Id.* But Mr. Williams doesn't make a connection between these observations and the facts of his own treatment.

Wexford argues that the one issue Plaintiff had with collegial review concerns the denial of his initial request for sunglasses. *Id.* But Plaintiff does not and cannot tie that to the findings of the 2014 Report. Wexford further asserts that Plaintiff does not identify a single instance in which he was denied off-site or follow-up care due to delays and scheduling issues of the type discussed in the 2014 Report. Mr. Williams' injuries are related to the collegial review process, optometry, and radiology. Neither optometry nor radiology care is discussed in the 2014 Report. Dkt. 127, at 6. As to the collegial review process, the 2014 Report recommends generally more

record-keeping and quicker follow-up. Dkt 131-1, at 28-32. Thus, the Court concludes that the 2014 Report is not relevant to Mr. Williams' claims.

But even if the 2014 Report were relevant, the Court is not convinced that its probative value isn't substantially outweighed by a danger of unfair prejudice to Wexford, confusion of the issues, and undue delay. As Wexford asserts, Mr. Williams "has had years to conduct discovery in this case and obtain what information he needs" to support his claim against Wexford and "has not been denied any opportunity to do so." Dkt. 127, at 9; *see also* Dkt. 141, at 9. Mr. Williams asserts that the 2014 Report is highly probative "especially because Wexford claims it does not maintain records regarding inmate grievances" and any confusion could be mitigated by a limiting instruction.[9] Dkt. 130, at 6. But the inmate grievance process is an IDOC process set by Ill. Admin. Code §504F *et seq*. *See* Dkt. 141, at 3. Mr. Williams does not claim that Wexford is in violation of this IDOC process. Further, the 2014 Report does not identify any particular issues with this statutory process, and the word "grievance" does not appear in the report, as it is focused on the medical care itself, not administrative review within the prison system. The Court does not find this evidence probative.

He further asserts that he would be prejudiced if the report is not admitted "because of his limited access to evidence of other claims against Wexford." *Id.* at 7. However, Mr. Williams makes no attempt to explain how his access was limited. The docket sheet in this matter does not indicate any motions to compel or similar discovery disputes where Mr. Williams attempted to gather evidence and was denied. This argument is unpersuasive and cuts against his argument

---

[9] Mr. Williams also asserts that the report should be admitted because other courts have done so. That in other cases, other courts whose authority is not binding on this Court have admitted the *Lippert* reports is of no significance here because it cuts both ways. Many other courts have excluded the *Lippert* reports as inadmissible hearsay. *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019) (collecting cases). This Court undertakes its own analysis based on the filings in this matter.

16

that the 2014 Report is intended only for notice. By Mr. Williams' logic, any inmate who was in one of the IDOC facilities reviewed during the time of Dr. Shansky's review would be able to use the 2014 Report as evidence. And Mr. Williams' suggestion of a limiting instruction to the jury to mitigate any unfair prejudice to Wexford is unhelpful at summary judgment. In this matter, Mr. Williams seeks to bring the entirety of the 2014 Report in, not only sections limited to his claims. It would be unfairly prejudicial to Wexford, as it has not had the opportunity to provide its own evidence in defense of the claims in the report. Thus, even if the 2014 Report were relevant, the Court excludes it under Rule 403. Fed. R. Evid. 403.

### B. Hearsay

The 2014 Report is inadmissible for the additional reason that it is hearsay. Out-of-court statements by a non-party offered to show the truth of the matter asserted are hearsay and are inadmissible unless they are non-hearsay by definition or satisfy an exception to the rule. Fed. R. Evid. 801-807. It is undisputed that the 2014 Report is an out-of-court statement made by a non-party, Dr. Shansky and his team. Wexford asserts that Mr. Williams is attempting to use it as substantive evidence because he has no other evidence supporting his claims, while Mr. Williams asserts that he's only using it to show that Wexford had notice, though he does not clarify what specific issue Wexford purportedly was on notice of. And it is not the Court's job to do so. *See Conwell v. Johnsen*, No. 12-cv-10062, 2016 U.S. Dist. LEXIS 155869, at *78 n.11 (N.D. Ill. Nov. 9, 2016) ("If Plaintiff is relying upon other provisions in the 2008 [DOJ] Report to support his *Monell* claim, he does not specifically identify those provisions and it is not this Court's job to 'sift through the record and make the case for a party.'") (internal citation omitted).

Mr. Williams asserts in response that he does not offer the report for the truth, but rather "as evidence to demonstrate Wexford's notice and knowledge that its policies and procedures deprived inmates of constitutionally adequate medical care." Dkt. 130, at 3. It is true that the report *may* be admissible to show notice, as Judge Hamilton has suggested in dissent and other courts within this district have found. *See Hildreth v. Butler*, 960 F.3d 420, 433 (7th Cir. 2020) (Hamilton, J., dissenting). In support of his assertion that "the 2014 Report is relevant to Wexford's notice and knowledge from independent court experts that its procedures caused significant and unnecessary delays in the delivery of medically necessary care and treatment, including off-site care," Mr. Williams relies on two cases in which summary judgment was ultimately granted in favor of Wexford: *Boyce v. Wexford Health Sources, Inc.*, No. 15-cv-7580, 2017 U.S. Dist. LEXIS 61655, at *44 n.12 (N.D. Ill. Apr. 24, 2017) and *Ryburn v. Obaisi,* No. 14-cv-4308, 2020 U.S. Dist. LEXIS 120267, at *38 (N.D. Ill. July 9, 2020),. Dkt. 130, at 4. First, *Boyce* doesn't support this premise because the district court stated that it did not need to reach the issue of whether the *Lippert* report could be admissible for notice because the plaintiff failed to establish an underlying constitutional violation. Second, although *Ryburn v. Obaisi,* No. 14-cv-4308, 2020 U.S. Dist. LEXIS 120267, at *38 (N.D. Ill. July 9, 2020) found the report admissible for notice purposes and denied summary judgment, approximately two months after Mr. Williams filed his response to the present motion, the district court granted summary judgment to Wexford on reconsideration. *See Ryburn v. Obaisi*, No. 14-cv-4308, 2022 U.S. Dist. LEXIS 82380, at *29 (N.D. Ill. May 6, 2022) ("[T]he [2014] Lippert Report, when considered as 'notice-only' evidence, is not sufficient to permit a rational jury finding of deliberate indifference, moving-force causation, or that plaintiff's case is the exceptional one where the risk

of harm is so patently obvious . . . the need for pattern or practice evidence is obviated.").
Neither of these sources are particularly persuasive.

In support of his position that he has evidence of these issues other than the 2014 Report
and the report is for notice only, Mr. Williams submitted affidavits of other inmates asserting
various issues with health care at Dixon. *See* Dkts. 131, 136-140. But, as Wexford notes, this is
an untimely disclosure of witnesses not identified in Mr. Williams' Rule 26(a)(1) disclosures and
violates Local Rule 56.1. The Court bars this evidence for that reason alone under Rule 37(c)(1).
Fed. R. Civ. P. 37(c)(1).

For all these reasons, Wexford's motion to exclude is granted.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Legal Standard

A successful motion for summary judgment demonstrates that there is no genuine dispute
of material fact and judgment is proper as a matter of law. A party opposing summary judgment
must proffer specific evidence to show a genuine dispute of fact for trial. Fed. R. Civ. P. 56;
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists if a
reasonable jury could return a verdict for the non-movant when viewing the record and all
reasonable inferences drawn from it in the light most favorable to the non-movant. *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing summary judgment "is entitled
to the benefit of all favorable inferences that can reasonably be drawn from the underlying facts,
but not every conceivable inference." *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811
F.2d 326, 329 (7th Cir. 1987). The court must construe the "evidence and all *reasonable*
inferences in favor of the party against whom the motion under consideration is made." *Rickher
v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008) (emphasis added). Summary judgment is

appropriate only when the court determines that "no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

Mr. Williams brings a claim against Wexford as the corporate entity itself, so it must arise under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), as a private company acting under color of state law. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). Under *Monell*, liability may exist in three circumstances: (1) the defendant employs an express policy that causes the constitutional injury, (2) the defendant has established a widespread practice that is so well settled that it constitutes a custom or usage, or (3) the defendant has final policymaking authority and has caused the constitutional injury. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). For an Eighth Amendment claim of deliberate indifference in a prison medical context, a plaintiff must establish two elements: (1) he suffered from an objectively serious medical condition; and (2) defendant prison official was deliberately indifferent to his condition so that defendant "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

To determine whether a prison official's actions or omissions constitute deliberate indifference, courts look to the official's subjective state of mind. *Petties*, 836 F.3d at 728. Although deliberate indifference does not require a showing of intent to harm, it does require more than recklessness, gross negligence, or even malpractice. *Id.*; *Rosario v. Brawn*, 670 F.3d 816, 821-22 (7th Cir. 2012) (explaining that the standard approaches "total unconcern" for an inmate's welfare). A plaintiff claiming deliberate indifference "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. This is a high hurdle. *Rosario*, 670 F.3d at 821. For example, "blatant disregard for medical

standards could support a finding of mere medical malpractice, or it could rise to the level of deliberate indifference, depending on the circumstances." *Petties*, 836 F.3d at 729. "A prison official may evidence deliberate indifference by failing to treat or delaying treatment of a serious medical need." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). However, "an inadvertent failure to provide adequate medical care" is not enough to rise to the level of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). And evidence of a plaintiff's diagnosis and treatment alone is often insufficient without other circumstantial evidence. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Petties*, 836 F.3d at 729. Health care protocols can provide "circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm." *Petties*, 836 F.3d at 729 (quoting *Mata v. Satz*, 427 F.3d 745, 757 (10th Cir. 2005)).

### B. Analysis

Wexford moves for summary judgment for two different reasons. First, Wexford argues that summary judgement should be granted as a matter of law because Mr. Williams is essentially proceeding on a respondeat superior theory of liability, which is improper for a *Monell* claim. Dkt. 126, at 3-4. Second, Wexford argues that Mr. Williams cannot satisfy the requirements for a *Monell* claim because (i) it had no express policy, only guidelines; (ii) there's no evidence that any employees relied on a policy or guideline; (iii) no final policymaker was involved in Mr. Williams's medical treatment; and (iv) there's no evidence that it was a widespread issue beyond Mr. Williams's own case, because the 2014 Report is hearsay and the five individual affidavits should be stricken. *Id.* at 4-7.

In response, Mr. Williams asserts that there is a dispute of fact whether Wexford's acts or omissions are evidence of deliberate indifference. Dkt. 132, at 7. He also asserts that (i) Wexford

21

had a policy, titled "Utilization Management Policies and Procedures"; (ii) the policy, which spells out collegial review, is unconstitutional as applied; (iii) delay in obtaining off-site care and prescriptions was a widespread issue detailed in the 2014 Report; and (iv) Mr. Williams personally experienced delays in his treatment that caused him pain and suffering. *Id.* at 8-9.

In reply, Wexford restates its arguments and raises several new arguments that could have been raised in its opening brief, but the Court deems those waived. *See Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir. 1992) (finding argument waived when moving party did not raise it until the reply brief, leaving non-moving party no opportunity to respond).

Because Wexford is the sole defendant, if Mr. Williams cannot establish *Monell* liability as a matter of law, his claim must fail. The Seventh Circuit has held that "a corporate entity violates an inmate's constitutional rights if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners. . . . In other words, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted). A policy or practice must be the direct cause or moving force behind the constitutional violation. *Id.* This can be shown in one of two ways: direct or indirect causation. *Estate of Novack v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000). To establish direct causation, a plaintiff must show that the policy itself is unconstitutional. *Id.* To establish indirect causation, a plaintiff must show a series of acts so bad that the policymaking level of government must have noticed, and by their failure to do anything to resolve it, effectively condoned it. *Id.*

Here, Mr. Williams argues that "Wexford's use of its collegial review policy is unconstitutional as applied," which is an indirect theory of municipal liability. Dkt. 132, at 8.

Citing only his own statement of material facts, he asserts, "[t]here is evidence that collegial review serves no real medical purpose because the referring or treating physician is not present, no medical records are reviewed, the medical request form provides only limited information and . . . each request is discussed for at most 2 to 3 minutes each." *Id.* There is simply no support for the first clause of that assertion. Mr. Williams asks the court to infer that "no medical purpose" is served by collegial review from these factual statements of Wexford's process. That is unreasonable. And the fact that Wexford's current contract does not include this same collegial review process is not evidence that it was unconstitutional as applied when he waited months to receive allegedly prescribed sunglasses or have off-site appointments scheduled.

Even if the Court admitted the 2014 Report to show Wexford had notice "that failing to timely schedule off-site care is a widespread problem," there would be problems. *Id.* "[E]vidence admitted only for notice cannot establish that a municipality acted with deliberate indifference unless the plaintiff also has substantive proof that the 'noticed' problems actually existed." *Dean*, 18 F.4th at 238. Because Mr. Williams has made generic, non-specific claims regarding what problems the report provided notice of, it is difficult to find substantive proof in the record to support this. Wexford asserts that there is none, and Mr. Williams has not produced it.

Next, Mr. Williams has failed to show how the two delays he cites—delay in receiving his sunglasses and delay in receiving a chest x-ray—caused him injury that amounts to cruel and unusual punishment. Dkt. 126, at 6-8. As Wexford asserts, Mr. Williams claims that his prescription for sunglasses was delayed on one occasion. Taking the facts in the light most favorable to Mr. Williams, even if there was evidence that Dr. Hicks put in the initial order for sunglasses on February 11, 2014, the Seventh Circuit has been clear that a successful *Monell* claim requires more than one instance—likely more than three—to demonstrate a widespread

custom or practice. *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). Further, Mr. Williams does not dispute that his condition did not worsen during this time, or that he was ever denied sunglasses again. In fact, he received multiple pairs and replacements when they broke—every request after was granted. He does not address how this initial one-time delay caused him injury or a serious risk of injury.

Additionally, Mr. Williams also claims he was denied an experimental gene therapy treatment that was not yet approved by the FDA. But persons in custody are not entitled to demand specific care, nor are they entitled to the best care possible—just constitutionally adequate care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). No reasonable jury could conclude that failing to provide experimental, unapproved therapy amounted to a violation of his constitutional rights. Without an underlying constitutional violation, there can be no claim under Section 1983.

Similarly, Mr. Williams's claim that the delay in getting an x-ray and it being read does not rise to the level of constitutionally inadequate care. Mr. Williams alleges that he was in "respiratory distress" and "forced to suffer for over a week," but the evidence does not support these claims. His medical records indicate that he presented with chest pain and shortness of breath, but his other vitals were stable. Even when the nurse heard a crackling in his lung, it did not signal pneumothorax. Yet, as soon as a radiologist saw his x-ray, he was rushed off-site to the emergency room for surgery (and it appears they did so without waiting for collegial review).[10] He never complained that the pain had gotten worse, and he continued his daily activities. Deliberate indifference can be inferred if treatment is so far off professional standards

---

[10] On January 14, 2016, new Wexford guidelines include exceptions to the collegial review process for emergent and urgent issues. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 239 (7th Cir. 2021).

that it seems it isn't based on medical judgment, *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), but that's not what the evidence shows. As to his RP and pneumothorax, the decisions were based on medical judgment, and just because a different doctor might have handled matters differently doesn't raise this action to the level of deliberate indifference. *Dean*, 18 F.4th at 241. Mr. Williams is not alleging that the nurse was negligent for failing to order a chest x-ray sooner or that Dr. Bautista or Dr. Ritz were negligent in their treatment of his RP.

Further, Mr. Williams does not meaningfully respond to any of Wexford's other arguments involving moving-force causation or policymaker involvement. Therefore, even if the Court were to find an underlying violation, and even if the Court were to determine that Wexford was on notice that their collegial review policy led to unconstitutional delays, Mr. Williams would need to establish that Wexford's policy *itself* caused the violation, and he has offered nothing to show  that the delays in his case were more than random occurrences. *See Thomas*, 604 F.3d at 303 ("[T]he plaintiff must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies, or a series of violations to lay the premise of deliberate indifference.") (internal citations omitted).

Thus, because there is no underlying constitutional violation, there can be no Section 1983 or *Monell* claim. And even if there were an underlying violation, no reasonable jury could find Wexford's widespread policy caused the violation.

**IV.    CONCLUSION**

For the above reasons, the Court grants Wexford's motion to exclude and grants

Wexford's motion for summary judgment with prejudice. Civil case terminated.


Date:   September 12, 2022              By:   _____
                                              IAIN D. JOHNSTON
                                              United States District Judge